`UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARTRICE CAMPBELL, | |
| Plaintiff, | Case No. 16-cv-6000 |
| v. | |
| CITY OF CHICAGO, et al., | Judge John Robert Blakey |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Martrice Campbell sued her former employer, the City of Chicago, and her former supervisor, Scott Ando, alleging that Defendants retaliated against her in violation of the First Amendment and Illinois law when they fired her from her job as an investigator with the City's Independent Police Review Authority (IPRA). Defendants moved for summary judgment. For the reasons explained below, this Court grants Defendants' motion.

## I.     Background

### A.     Local Rule 56.1 and Evidentiary Rules

The facts in this discussion come from Defendants' Local Rule 56.1 statement of material facts [66] and Plaintiff's Local Rule 56.1 statement of additional facts [73]. Plaintiff's response to Defendants' statement of facts [74] raises numerous issues that this Court addresses before turning to the facts themselves.

This Court has broad discretion to enforce the local rules governing summary judgment. *See, e.g.*, *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014);

*Benuzzi v. Bd. of Educ. of Chi.*, 647 F.3d 652, 655 (7th Cir. 2011). Under the local rules, a party's responses to the other party's statements of fact must contain "specific references" to record evidence to justify any denial. L.R. 56.1(b)(3); *see also Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). Purely argumentative denials, legal conclusions, and unsupported general denials do not belong in Local Rule 56.1 statements. *See Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012); *Malec*, 191 F.R.D. at 584. District courts may disregard any improper denials and deem the opponent's corresponding fact statements admitted. *See Aberman v. Bd. of Educ. of Chi.*, 242 F. Supp. 3d 672, 677 (N.D. Ill. 2017).

Despite Local Rule 56.1, Plaintiff's responses to Defendants' facts abound with legal and factual arguments. For example, in response to paragraph 7—which quotes former IPRA employee Brian Lockhart—Plaintiff admits the accuracy of the quote, but then argues that this Court should strike paragraph 7 because one of the cited exhibits misquotes her elsewhere, thus misrepresenting facts (on a subject that paragraph 7 does not address). [74] at 3. As courts in this district have made clear, Local Rule 56.1 does not create "a forum for factual or legal argument." *Malec*, 191 F.R.D. at 585. The local rules require Plaintiff to present her version of the facts in her own statement; they do not allow for making such factual arguments in response to the other side's statement. *See id.* By way of illustration, Plaintiff's other violations of Local Rule 56.1 include: denying possible inferences that a fact-finder could draw from an otherwise admitted fact, *see, e.g.*, [74] at 5; arguing the materiality of certain facts, *see, e.g.*, *id.* at 8; and making extensive legal arguments

about the weight that this Court should give to an arbitrator's ruling in proceedings about Plaintiff's dismissal from IPRA, *id.* at 33–34. All these responses violate Local Rule 56.1. *See, e.g.*, *Grabianski v. Bally Total Fitness Holding Corp.*, 169 F. Supp. 3d 785, 788 (N.D. Ill. 2015) ("L.R. 56.1 submissions are not the proper venue for presenting legal arguments or for developing whatever 'spin' the parties wish to place on the facts."). Because district courts have discretion to require strict compliance with Local Rule 56.1, *Petty*, 754 F.3d at 420, this Court deems admitted the following paragraphs in Defendants' statement of facts: 7–14, 16–17, 19–22, 26–28, 30–31, 34–35, 40–42, 46, 49–50, 52, 54–55, 62–64.

This Court also notes that Plaintiff lodged a "general hearsay objection" to Defendants' facts, claiming that Defendants cannot rely upon Lockhart's out-of-court statements because they constitute inadmissible hearsay. [74] at 1. Not so. Defendants offer Lockhart's statements to show their effect on the listener, not to prove the truth of his statements. Thus, this Court disregards Plaintiff's hearsay argument. *See United States v. Shaw*, 824 F.3d 624, 630 (7th Cir. 2016) (identifying effect on the listener as a valid non-hearsay purpose). The same rationale applies to the hearsay arguments that Plaintiff raised in response to other individuals' statements that Defendants cite in their facts.

## B. Lockhart's Statements About IPRA Supervisors

Plaintiff worked as an investigator at IPRA, the City agency charged with investigating allegations of misconduct against the Chicago Police Department (CPD). [66] ¶ 3. Her responsibilities included gathering evidence, interviewing police

officers, and testifying at proceedings that could lead to disciplinary action or criminal charges against officers. *Id.* ¶ 4. Ando held multiple high-level roles within IPRA at the relevant times, including Chief Administrator. *Id.* ¶ 2.

On January 10, 2013, Lockhart started speaking to Plaintiff and Lisa Tousant, an IPRA intake aid, at Plaintiff's desk. *Id.* ¶ 6. During the conversation, Lockhart threatened three IPRA supervisors, saying he would "kill Ilana Rosenzweig's ass, then that bitch Katherine Martinez, and I will get Scott Ando's motherfucking ass when he comes running." *Id.* ¶ 7. When Plaintiff told Lockhart that he could go to jail for making that statement, Lockhart responded: "I won't go to jail. I'll kill Ilana, Katherine, then Scott, and then I'll kill myself before I ever go to jail." *Id.* ¶ 8. Lockhart told Plaintiff and Tousant that he was serious about his threat. *Id.* ¶ 9.

At that point, Plaintiff felt alarmed and took Lockhart to a private interview room in the IPRA office. *Id.* ¶ 10. Plaintiff maintains that Lockhart showed a "wounded and childlike" demeanor in the interview room and denied intending to kill Rosenzweig, Martinez, and Ando, but insisted that he would kill himself. [73] ¶¶ 3, 5–6. Plaintiff called CPD's Personal Support Program (PSP) and reported that an employee threatened suicide and homicide against three IPRA supervisors; she then took Lockhart to the hospital. [66] ¶ 11. Ando was not in the IPRA office when Lockhart made his threats, but PSP called Ando to tell him that Lockhart had seriously threatened to kill him, Rosenzweig, and Martinez. *Id.* ¶ 12.

Plaintiff met with Ando later that day and detailed Lockhart's specific threats that he would "go postal" and "kill Ilana's ass," "kill that fucking bitch Katherine,"

and then kill Ando when he "comes running down the hall to play the hero and save their asses." *Id.* ¶ 13. Plaintiff also told Ando that Lockhart said he had no concerns about going to jail because he would kill himself first. *Id.* Ando testified that he thought Plaintiff took Lockhart's threats seriously, given how specifically she recounted them to him. *Id.* ¶ 14. Plaintiff testified that she told Ando during their meeting that Lockhart eventually said he did not intend to kill anyone besides himself. [73] ¶ 9. By contrast, Ando maintains that Plaintiff never did anything before Lockhart's criminal trial to suggest that Lockhart did not intend to harm anyone else at IPRA. [66] ¶ 15.

After meeting with Plaintiff, Ando met with Tousant, who echoed Plaintiff's description of Lockhart's threats almost verbatim. *Id.* ¶ 17. Ultimately, shortly after Plaintiff first reported Lockhart's threats, IPRA deactivated Lockhart's access pass to the building, notified security that he could not enter the building, and placed him on administrative leave. *Id.* ¶ 18. IPRA also notified Rosenzweig and Martinez (who had been out of the office that day), the Mayor's Office, and the City's Department of Human Resources about Lockhart's threats and the agency's preliminary response. *Id.* ¶ 19. IPRA then filed a police report about Lockhart's threats. *Id.* ¶ 23.

The responding CPD officer interviewed Plaintiff and recorded her description of Lockhart's statements, including that Lockhart said: "You think I'm kidding? I am serious. I will kill all their asses!" *Id.* ¶ 24. Plaintiff says that the officer's report misrepresents what Lockhart said in the interview room and omits her statement that Lockhart eventually retracted his threats against the supervisors and said he

only wanted to kill himself.  [73] ¶¶ 11–13.  The officer also interviewed Tousant, who corroborated Plaintiff's description of the threats that Lockhart made while at Plaintiff's desk.  [66] ¶ 27.  On January 11, Tousant submitted an official memorandum describing the previous day's events; she wrote that Lockhart twice stated that he would kill Rosenzweig, Martinez, and Ando, and that Lockhart said he was serious about the threats.  *Id.* ¶ 28.

CPD assigned two detectives to investigate Lockhart's threats.  *Id.* ¶ 29.  The detectives spoke to Plaintiff on two occasions; she reported both times that Lockhart said he would kill the three IPRA supervisors and that Lockhart responded to her warning about jail time by saying he was serious about the threats and would kill himself before going to jail.  *Id.* ¶ 30.  Plaintiff maintains that she told the detectives that Lockhart retracted his threats to kill the supervisors after Plaintiff took him to the interview room, but the detectives omitted that information from their report. [73] ¶ 16–18.  The detectives also interviewed Tousant, who again corroborated Plaintiff's story that Lockhart twice threatened to kill Rosenzweig, Martinez, and Ando and then said that he made the threats seriously.  [66] ¶ 31.

### C.    Lockhart's Trial and Plaintiff's Termination

After the detectives completed their investigation, they arrested Lockhart and charged him with one count of threatening a public official.  *Id.* ¶ 37.  Lockhart's bench trial occurred over three days in 2014; Plaintiff testified on the second day of trial.  *Id.* ¶ 38.

When the prosecutor asked Plaintiff what Lockhart said during their January 10 conversation near Plaintiff's desk, Plaintiff testified: "the gist of the conversation

was he was expressing displeasure and pain over issues with our superiors, our bosses." [68-9] at 23. The prosecutor asked what Lockhart "specifically said in regards to his displeasure with the bosses," and Plaintiff responded: "Something to the effect of he can't bear them continuing to talk with him, and he expressed wishes that they would be dead or he wanted them to be killed." *Id.* at 24. Plaintiff also testified that she brought Lockhart into an interview room, at which point he explained that he did not intend to kill the supervisors and "just really wished they would leave him alone." *Id.* at 26; [73] ¶ 27. In November 2014, the presiding judge orally issued a directed verdict acquitting Lockhart. [66] ¶ 43. In issuing his ruling, the judge characterized Plaintiff's testimony as the "most notable." *Id.* ¶ 44.

Ando found the acquittal surprising, given what Plaintiff and Tousant had previously reported to IPRA and CPD about Lockhart's statements. *Id.* ¶ 46. Ando spoke to the prosecutor to ask how the case ended in an acquittal, and she told Ando that she thought she lost the case when Plaintiff became a "hostile" witness. *Id.* ¶ 48. Ando also started trying to obtain transcripts from the trial; he received an uncertified transcript of Plaintiff's testimony in March 2015 and a certified copy in April 2015. [68-2] at 81–82. Finally, Ando reviewed police reports concerning the Lockhart incident. [66] ¶ 49; [74-1] at 2.

By March 5, 2015, Ando had decided to discipline Plaintiff for making (in his view) false statements during Lockhart's criminal trial. [73] ¶ 35. He then asked IPRA employees "with knowledge regarding the Lockhart matter" to prepare memos about the event; all memos "indicated that Plaintiff reported that Lockhart continued

to express that he was serious about his threats." [66] ¶ 49. In late May 2015, Plaintiff received a Statement of Charges and Explanation of Evidence notifying her that her discharge "was under consideration" for giving incomplete or false testimony at trial that contradicted her statements to police and IPRA personnel. *Id.* ¶ 52. The City gave Plaintiff until June 8 to respond to the charges. *Id.* ¶ 53.

Ando testified that he had not yet decided to fire Plaintiff when he gave her the charges, and he would have considered imposing lesser discipline if her written response to the charges suggested that firing her was not appropriate. [68-7] at 19. Plaintiff failed to respond to the charges. [66] ¶ 53. Ando decided to fire Plaintiff on June 8. *Id.* ¶ 56. Given Plaintiff's failure to explain her inconsistent sworn testimony, Ando believed that allowing her to remain at IPRA would cause other employees to lose confidence in the agency and would cause CPD to question investigations that Plaintiff led. *Id.* ¶ 55. He also gave significant weight to the need for IPRA employees to be consistently truthful, given their line of work. *Id.* ¶ 54.

### D.    Plaintiff's Arbitration Hearing

In the fall of 2015, the City and Plaintiff participated in a multi-day arbitration hearing about her termination; the arbitrator heard from 12 witnesses about the Lockhart incident and Plaintiff's subsequent testimony. *Id.* ¶ 57. During the arbitration, Plaintiff said that her trial testimony accurately summarized her January 10 conversation with Lockhart based upon what she could recall about the incident at trial. *Id.* ¶ 58. Plaintiff also said that the prosecutor did not prepare her to testify until the day of trial, and then prepared with her for only ten minutes

without reviewing any police reports. [73] ¶¶ 20–22. Lockhart's prosecutor testified at the arbitration and said that Plaintiff's trial testimony matched her answers during their preparation meeting, *id.* ¶ 29, but the prosecutor also testified that Plaintiff told her during the preparation meeting that Lockhart "did say that he was going to kill his bosses, and he did name who they were," [73-1] at 39.

The arbitrator upheld Plaintiff's termination. [66] ¶ 62. The arbitrator concluded that the City met its burden of proving—"under any evidentiary standard"—that Plaintiff intentionally testified falsely at Lockhart's trial "by deliberately refusing to make any mention of Mr. Lockhart's statement that he intended to kill, in order, Ms. Rosenzweig, Ms. Martinez, and Mr. Ando, and the fact that he was serious in his intentions." *Id.* ¶ 63.

## II. Legal Standard

Courts should grant summary judgment when the moving party shows that no genuine dispute exists as to any material fact and the evidence weighs so heavily in the moving party's favor that the moving party "must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also* Fed. R. Civ. P. 56. A genuine dispute as to a material fact exists when, based upon the evidence, a reasonable jury could find for the non-moving party. *Anderson*, 477 U.S. at 248. To show a genuine dispute as to a material fact, the non-moving party must point to "particular materials in the record," and cannot rely upon the pleadings or speculation. *Olendzki v. Rossi*, 765 F.3d 742, 746 (7th Cir. 2014).

At summary judgment, courts must evaluate evidence in the light most favorable to the non-moving party and refrain from making credibility

determinations or weighing evidence. *Rasho v. Elyea*, 856 F.3d 469, 477 (7th Cir. 2017) (citing *Anderson*, 477 U.S. at 255). The moving party bears the burden of establishing the lack of genuine disputes as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## III. Analysis

Plaintiff's complaint alleges a First Amendment retaliation claim as well as an Illinois common law retaliatory discharge claim. [1] at 33–38, 39–42. First, Defendants argue that Plaintiff's First Amendment retaliation claim fails because Defendants were justified in terminating her employment due to her allegedly misleading and incomplete trial testimony. [67] at 5–6. Specifically, they argue that: (1) Plaintiff's testimony was knowingly or recklessly false; (2) Ando reasonably believed Plaintiff's trial testimony was false; (3) Ando is entitled to qualified immunity; and (4) there is insufficient evidence to submit the issue of punitive damages to a jury. *Id*. at 7–14. Second, Defendants argue that Plaintiff's retaliatory discharge claim fails because she cannot establish the required elements. *Id*. at 15–16.

### A. First Amendment Retaliation

Defendants argue that Plaintiff's First Amendment claim fails for multiple reasons, including that Ando reasonably believed that Plaintiff gave false testimony at Lockhart's trial and that Ando merits qualified immunity. [67] at 9–13. Plaintiff contends that genuine issues of material fact regarding the truth of her testimony and Ando's beliefs about her testimony preclude summary judgment. [72] at 5–11.

### 1. Plaintiff's First Amendment Claim Depends Upon Ando's Reasonable Belief

The First Amendment protects public employees' free-speech rights to a certain degree, but "the government has a freer hand in regulating the speech of its employees than in regulating the speech of the public at large." *Wright v. Ill. Dep't of Children & Family Servs.*, 40 F.3d 1492, 1500 (7th Cir. 1994). Thus, to succeed on a claim for retaliation in violation of the First Amendment, a public employee must show that: (1) she made a constitutionally protected statement; (2) she suffered a deprivation likely to deter speech; and (3) the protected speech at least partially motivated the employer's action. *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013); *Peele v. Burch*, 722 F.3d 956, 969 (7th Cir. 2013). A public employee's speech qualifies as constitutionally protected if: (1) the employee made the speech as a private citizen; (2) the speech addressed a matter of public concern; and (3) the government's interest as an employer in "promoting effective and efficient public service" did not outweigh the employee's interest in expressing the speech. *Swetlik*, 738 F.3d at 825 (quoting *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008)).

This last element requires courts to engage in the *Pickering* balancing test. *Pickering v. Board of Education*, 391 U.S. 563 (1968). Under *Pickering* and its progeny, when an employee speaks "with a reckless disregard for the truth" the employer's interests outweigh the speaker's interests, and thus the employee's speech does not merit constitutional protection. *Swetlik*, 738 F.3d at 826, 827. Additionally, even if an employee's speech *was* truthful, a public employer may defeat a First Amendment retaliation claim by showing that the employee's supervisors reasonably

believed, after an adequate investigation, that the employee provided false or misleading testimony. *Wright*, 40 F.3d at 1506 (citing *Waters v. Churchill*, 511 U.S. 661, 677 (1994) (plurality opinion) (courts applying *Pickering* balancing must "look to the facts as the employer *reasonably* found them to be")); *see also Waters*, 511 U.S. at 685 (Souter, J., concurring) (explaining that a majority of the Court approved the plurality's reasonableness test). The parties here dispute only how *Pickering* balancing applies to Plaintiff's testimony at Lockhart's trial.

The parties spend considerable time debating whether Plaintiff spoke "with a reckless disregard for the truth" when testifying at Lockhart's trial. Defendants argue that Plaintiff's testimony willfully omitted key details—that Lockhart specifically threatened to carry out the threats to kill Rosenzweig, Martinez, and Ando—and that such an omission constitutes "half-truth" testimony aimed at misleading the fact finder. [78] at 7. Plaintiff argues that that there is a genuine issue of material fact about whether her testimony was knowingly or recklessly false for multiple reasons, including that her testimony was the result of limited preparation by the prosecutor. [72] at 6; [73] ¶¶ 20–22.

But the question before this Court—whether Defendants were justified in terminating Plaintiff based upon her testimony—does not hinge upon whether Plaintiff's trial testimony was made in reckless disregard for the truth. The Supreme Court has made clear "that employees may not recover in damages from employers who make reasonable mistakes," regardless of the veracity of the employee's statements. *Wright*, 40 F.3d at 1506 (citing *Waters*, 511 U.S. at 680–81). Thus, the

Court must determine instead whether Ando terminated Plaintiff because he genuinely and reasonably believed, based upon an adequate investigation, that Plaintiff provided false or misleading testimony (either intentionally or with reckless disregard for the truth).

Here, Plaintiff fails to present sufficient evidence from which a reasonable jury could conclude that Ando's belief was disingenuous, unreasonable, or based upon an inadequate investigation.

### 2. Plaintiff Fails to Present Sufficient Evidence That Ando's Investigation Was Inadequate

First, Plaintiff argues that Ando "did not conduct any investigation into whether her testimony was false," and thus his belief was "not based on the facts and was unreasonable." [72] at 7. In support of this assertion, Plaintiff merely relies upon one mischaracterized quote from Ando's deposition testimony. When asked if he did an investigation of Plaintiff in 2015, Ando summarized some of the steps that he took as part of the employment review and replied in relevant part: "I guess it would depend on how you define an investigation. . . So is that an investigation? I don't think so. I guess you could consider it one." *Id.*; [73] ¶ 33.

But the adequacy of Ando's investigation does not hinge upon whether he knew what exactly constitutes a human resources "investigation" for purposes of employment retaliation law. Moreover, far from conducting no investigation whatsoever, the record shows that Ando took multiple investigatory steps before terminating Plaintiff. For example, Ando spoke with the prosecutor about the case; obtained transcripts from the trial; reviewed police reports concerning the Lockhart

incident; requested and reviewed memos from IPRA employees with knowledge regarding the incident; worked with the City's Department of Law to create and deliver a Statement of Charges and Explanation notifying Plaintiff that her discharge "was under consideration"; and offered Plaintiff a formal opportunity to respond to the charges (which she chose not to do). [66] ¶ 48−49, 52−53; [68-2] at 83; [74-1] at 2.

Under controlling and persuasive authorities, these actions undoubtedly constitute an adequate investigation. In *Waters*, the Supreme Court approved an employer investigation comprised of interviewing an employee who originally complained about the plaintiff's speech; questioning another employee who had witnessed the conversation; and conversing with the employee whose speech was at issue. *Waters*, 511 U.S. at 680. The Fifth Circuit has also provided a helpful metric in deciding what constitutes a reasonable investigation. In *Johnson v. Louisiana*, 369 F.3d 826 (5th Cir. 2004), the court found that employers had conducted a reasonable investigation based upon the fact that: (1) the employer received statements from three employees; (2) obtained a supervisor's report stating that the supervisor believed the plaintiff was lying; and (3) the plaintiff failed to present any evidence in his own support, even when invited to do so. *See Johnson*, 369 F.3d at 832. Here, Ando spoke with more people and reviewed more reports than in both *Waters* and *Johnson*. He also invited Plaintiff to present pre-termination evidence in her own support as part of the investigation, which she notably failed to do. Thus,

Ando's investigation not only followed the guidelines of *Waters* and *Johnson*, but went above and beyond them.

Plaintiff is also mistaken in arguing that *Swetlik*—in which the employer hired an outside investigator and conducted more than 80 interviews—establishes a baseline for what constitutes an "adequate" investigation. [72] at 9. The approved investigation in *Waters* establishes that such an in-depth process is obviously sufficient, but not necessary, to adequately investigate one employer's speech. *Waters*, 511 U.S. at 680. Moreover, the broad external investigation in *Swetlik* arose from 37 grievances filed by an entire police union that ultimately led to a no confidence vote in a police chief; the truthfulness of the plaintiff's statement was a small issue within a much larger and far-reaching investigation. 738 F.3d at 822−23. There "will often be situations in which reasonable employers would disagree about who is to be believed, or how much investigation needs to be done," and in "those situations, many different courses of action will necessarily be reasonable." *Id*. at 829 (quoting *Waters*, 511 U.S. at 678). But because "management can only spend so much of their time on any one employment decision," procedures should be condemned as unreasonable only if they fall "outside the range of what a reasonable manager would use." *Waters*, 511 U.S. at 678, 680. Ando's investigation undoubtedly meets this reasonableness threshold.

### 3. Plaintiff Fails to Present Evidence That Ando's Belief Was Pretextual

Second, Plaintiff argues that a genuine dispute exists as to whether Ando's belief was genuine or reasonable. Specifically, she claims that a reasonable jury could

conclude that "Ando was upset Lockhart had been acquitted and was looking for someone to blame for that outcome." [72] at 8. There is nothing in the record to support this claim. Plaintiff points to an email Ando sent to Rosenzweig on March 5, 2015 in which he requested a memorandum because he had decided to "proceed with discipline" against Plaintiff and Tousant. *Id.* Because Ando did not receive a certified transcript of Plaintiff's testimony until April 3, 2015, Plaintiff argues that this shows Ando decided to "discipline" Plaintiff for her trial testimony without reviewing the transcript. *Id.* Although the record evidence shows that Ando had uncertified transcripts of Plaintiff's testimony in March of 2015, [68-2] at 81−82, the exact timing of when Ando received the certified trial transcript remains irrelevant for two reasons.

First, Ando's March 5th email only alluded to potential "discipline" procedures against Plaintiff, not termination. As such, rather than indicate that he had already decided to terminate Plaintiff on March 5th, 2015, his email instead demonstrates that, by requesting more information at that time, he was conducting the very investigation that Plaintiff claims never occurred. Moreover, the record also contains Ando's uncontroverted testimony that he had not decided to fire Plaintiff when he gave her the charges in late May and would still have considered imposing lesser discipline if her written response to the charges suggested that firing her was not appropriate. [68-7] at 19.

Second, at the latest, Ando had access to the certified transcript by mid-April 2015—well before Ando made the decision to deliver the Statement of Charges to

Plaintiff in late May of that year. [68-2] at 81−83. It is also undisputed that at the time Plaintiff was terminated in June—over three months after he sent the email to Rosenzweig—Ando had relied upon the transcripts of sworn testimony, as well as a conversation with the prosecutor, police and detectives' reports, internal IPRA memos, and the City's Department of Law to conclude that Plaintiff's actions justified termination. [66] ¶ 48−49, 52−53; [68-2] at 83; [74-1] at 2. He knew that Plaintiff's statements excluded the threats that she herself had reported to multiple individuals within the IPRA and CPD. [66] ¶¶ 11−13, 16, 24, 30, 49. Moreover, he had given significant weight to the need for IRPA employees to be consistently truthful, given the nature of their line of work. [66] ¶ 54. While the Court must evaluate evidence in the light most favorable to the non-moving party on summary judgment, that duty "does not extend to drawing inferences that are supported by only speculation or conjecture." *Swetlik*, 738 F.3d at 829 (citing *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1176 (7th Cir. 2013)). As such, Plaintiff cannot create a material factual dispute by merely concluding that Ando had "already made up his mind to discipline her and was papering up" his investigation to do so, [72] at 8−9.

### 4. Plaintiff Fails to Present Sufficient Evidence That Ando's Reliance on Police Reports Was Unreasonable

Finally, Plaintiff argues that Ando's decision could be found unreasonable because his investigation relied upon police reports which she claims mischaracterized her statements. *See, e.g.*, [72] at 10. But the fact remains that, at the time he made his termination decision, Ando had no reason to doubt the accuracy of the multiple police reports documenting Plaintiff's initial descriptions of Lockhart's

17

threats. Indeed, Plaintiff chose not to take advantage of Ando's pre-termination invitation to provide clarifying information when she failed to respond to the Statement of Charges. [66] ¶ 53. The Supreme Court in *Waters* explained that courts applying *Pickering* balancing must "look to the facts as the employer reasonably found them to be," not to claims brought to the employer's attention *after* terminating the employee. *Wright*, 40 F.3d at 1506 (citing *Waters*, 511 U.S. at 677). Thus, Plaintiff's post-termination explanations made during her arbitration hearing or during this litigation (even if believed), remain irrelevant to any analysis of Ando's termination decision. What Ando knew at the time he decided to terminate Plaintiff controls, and at that time, everyone who spoke with her recounted a nearly identical version of Plaintiff's descriptions of Lockhart's threats, but then Plaintiff failed to describe the same threats while later testifying under oath at Lockhart's criminal trial. *See, e.g.*, [66] ¶¶ 11–13, 16–17, 24, 30, 49–50. Based upon this information, Ando's belief that Plaintiff's testimony was false or misleading was undoubtedly reasonable. Absent contradictory evidence in the record (and there is none), this Court cannot second-guess Ando's decision.

Based upon the record, Plaintiff fails to present sufficient evidence from which a reasonable jury could conclude that Ando's belief regarding her testimony was disingenuous, unreasonable, or based upon an inadequate investigation. Thus, this Court grants summary judgment to Defendants on Plaintiff's First Amendment retaliation claim. Having concluded that there is no genuine issue of material fact as to Defendants' reasonable belief, and thus no First Amendment retaliation claim, this

Court need not consider Defendants' alternative qualified immunity and punitive damages defenses.

## B.    Retaliatory Discharge under Illinois Law

Plaintiff argues that her termination violated Illinois public policy favoring the investigation and prosecution of criminal offenses as established in *Palmateer v. International Harvester Co.*, 421 N.E.2d 876 (Ill. 1981), and that Ando's motive for her termination is a question for the jury. [72] at 12. Defendants argue that they are entitled to summary judgment on Plaintiff's retaliatory discharge claim, because her termination did not violate a clearly established public policy and there is no causal connection between the mere fact that she gave testimony and her termination. [67] at 14−15.

To state a valid retaliatory discharge cause of action, an employee must allege: (1) the employer discharged the employee; (2) in retaliation for the employee's activities; and (3) in violation of a clear mandate of public policy. *Reid v. Neighborhood Assistance Corp. of Am.*, 749 F.3d 581, 586 (7th Cir. 2014); *Turner v. Mem'l Med. Ctr.*, 911 N.E.2d 369, 374 (Ill. 2009). Although what constitutes a "clearly mandated public policy is not precisely defined" under Illinois law, the tort has been "narrowly construed in Illinois to include only discharges in retaliation for certain activities, such as reporting an employer's criminal violations, or violations of health and safety standards." *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622 (7th Cir. 2009) (internal citations omitted); *see also Michael v. Precision Alliance Group, LLC*, 21 N.E.3d 1183, 1190 (Ill. 2014) ("Retaliatory discharge claims are a narrow exception

to the general rule that employees are at-will."); *Fisher v. Lexington Health Care*, 722 N.E.2d 1115, 1121 (Ill. 1999) (noting that the Illinois Supreme Court has "consistently sought to restrict the common law tort of retaliatory discharge.").

Initially, Plaintiff is correct in that there "is a clear public policy favoring investigation and prosecution of criminal offenses." *Palmateer*, 421 N.E.2d at 880. In *Palmateer*, the plaintiff alleged that he was discharged for: (1) supplying information to local law-enforcement authorities that a fellow employee might be violating Illinois' criminal code; (2) agreeing to gather further evidence implicating the employee; and (3) intending to testify at the employee's trial. *Id.* at 879. In holding that the plaintiff's suit had been improperly dismissed, the *Palmateer* court noted that while no "specific constitutional or statutory provision requires a citizen to take an active part in the ferreting out and prosecution of crime . . . public policy nevertheless favors citizen crime-fighters." *Id.* at 880.

But the mere fact that Plaintiff gave testimony, regardless of whether it was truthful, simply does not fall under the umbrella of "citizen crime fighter." Had Plaintiff been discharged for simply agreeing to testify in Lockhart's criminal trial, or for agreeing to assist in an investigation into Lockhart's behavior, she may have been engaging in protected activity under *Palmateer*. But nothing in the record shows that Defendants discouraged Plaintiff's decisions to testify at Lockhart's trial or to cooperate with law enforcement officials. To the contrary, all evidence suggests that Ando supported Plaintiff's efforts to do so from the beginning, actively meeting with her immediately after Lockhart made his threats and taking significant steps to

protect his employees based upon her initial statements about Lockhart's behavior. *See, e.g.*, [66] ¶ 13, 18−19.

The record further fails to contain any evidence that Ando instructed Plaintiff to testify in a certain way or terminated her for refusing to commit perjury, which might also have constituted protected activity under Illinois law. *See Blount v. Stroud*, 904 N.E.2d 1, 9−11 (Ill. 2009) (recognizing that actions for retaliatory discharge have been allowed where the employee was discharged for refusing to violate a statute which makes the commission of perjury unlawful). Instead, neither party disputes here that Ando terminated Plaintiff precisely because he believed her testimony *did* constitute perjury. Plaintiff has not pointed to a single case or authority to suggest that discharging an employee based upon a reasonable belief that she testified falsely in a criminal trial is against public policy. Absent such an authority, Plaintiff's mere act of providing testimony simply does not constitute protected activity under *Palmateer*. S*ee also Turner*, 911 N.E.2d at 501−02 ("It is widely recognized that the existence of a public policy, as well as the issue whether that policy is undermined by the employee's discharge, presents questions of law for the court to resolve.") (internal citations omitted). Thus, this Court grants summary judgment to Defendants on Plaintiff's retaliatory discharge claim.

## IV. Conclusion

This Court grants Defendants' motion for summary judgment [65].  The Clerk shall enter judgment for Defendants and against Plaintiff.  All dates and deadlines are stricken.  Civil case terminated.

Dated:  September 26, 2018

Entered:

John Robert Blakey
United States District Judge